# MERRIMACK,

## JULY TERM, A. D. 1849.

19 403
70 604!

## McNeil & a. v. Call.

Where the agent of a mortgagee agreed that if the mortgage debt should be paid by a certain time subsequent to its becoming due, no advantage should be taken of a foreclosure, and a tender of the amount was made in accordance with the agreement, it was held that the forfeiture was waived and the foreclosure opened.

Where the conduct of the agent of a mortgagee was unconscientious and oppressive toward the mortgager, it was held in a bill by the mortgager to redeem, that he was entitled to costs.

Where a tender of the debt was made to the mortgagee, in pursuance of an agreement, it was held that interest should not be cast on the debt after the tender.

IN EQUITY. The bill stated the following case :

On the 24th day of October, 1842, William P. Hardy owned a tract of land situated in Concord, and described in the bill. At the same time, he owed the Exeter Bank the sum of six hundred and fifty dollars, according to his four several promissory notes of that date, one for the sum of $150, payable on the first day of January, 1843, one for $100, payable on the first day of July, 1843, one for $200, payable on the first day of July, 1844, and one for $200, payable on the first day of July, 1845. On the 24th day of October above mentioned, he mortgaged one undivided half of the premises to the Exeter Bank, to secure the payment of the notes.

On or about the first day of January, 1843, he paid the bank

the amount due on the first mentioned note. On the 9th day of March, 1843, he conveyed the premises to David G. Fuller, and in consideration thereof, among other things, Fuller agreed to take the land, subject to the mortgage, and to pay the amount due on the remaining notes.

On the 8th day of July, 1842, the plaintiffs and David G. Fuller, William P. Hardy and John Pettingill gave to the Merrimack County Bank their promissory note, for one thousand dollars, payable in ninety days, in which note Fuller was principal, and the other signers were sureties. On the 22d day of April, 1843, there was due on the note the sum of $500, " and some interest," and on that day Fuller conveyed the premises to the bank, to secure the amount due on the note, which conveyance was duly recorded.

On the 10th day of June, 1844, the plaintiffs paid the Merrimack County Bank $543 86, the sum due on the note, and thereupon the bank assigned to them the note and mortgage, which they still hold.

On the 5th day of August, 1845, Fuller, for a valuable consideration, conveyed to the plaintiffs all his interest in the premises.

Prior to this time, on the 11th day of November, 1844, Fuller, having the right in equity to redeem the premises mortgaged to the Exeter Bank, the bank then holding the notes and mortgage, tendered to the bank the sum of $377, being the amount due on the notes, but the bank refused to receive it, and Fuller then deposited the money in the hands of Orrin Foster of Concord, to be delivered to the bank on their request, and giving the bank notice thereof, which money has ever since remained in the hands of Foster.

On the 18th day of April, 1845, the Exeter Bank assigned the notes and all their interest in the land to Nathan Call, the defendant, who, at the time of the conveyance, had full knowledge and notice of the premises.

On the 6th day of July, 1845, Fuller tendered to Call the

McNeil *v.* Call.

further sum of $209 10, being the sum remaining due on the notes, which sum Call refused to receive.

From the time when Hardy conveyed the land to Fuller, until Fuller conveyed it to the plaintiffs, Fuller was in open and visible possession of the premises, and since Fuller's conveyance to the plaintiffs, he has been in possession of the premises, under the the plaintiffs, and as their tenant.

The bill alleges that Call, confederating, &c., refuses to admit the plaintiffs to redeem the premises, and refuses, also, to release and discharge the mortgage.

The bill prays for an answer, and that Call be decreed to receive the money tendered, and to admit the plaintiffs to redeem the premises, and to deliver to the plaintiffs a sufficient release and discharge thereof, upon the plaintiffs bringing into court and depositing with the clerk the several sums of $377 and $209 10, and for general relief.

The answer alleges that, on the 3d day of October, 1843, the Exeter Bank, then holding the three last mentioned notes, the first one having been paid, and also holding the mortgage, entered and took peaceable possession of the premises, for the purpose of foreclosing, by their duly authorized agent, and took an attornment from Fuller, the tenant in possession, and kept the continued, actual, peaceable possession thereof, for the period of one year before the tender of the sum of $377 first mentioned in the bill, to wit, until and after the 4th day of October, 1844, and published due notice thereof in the N. H. Courier, &c., which facts the defendant pleads in bar of the bill.

Evidence was taken on both sides. Arthur Fletcher, a witness for the plaintiffs, testified in substance as follows: In the month of September, 1844, Fuller was in possession of the premises, one half of which was mortgaged to Mrs. Evans, and one-half to the Exeter Bank. Ephraim Eaton had acted as agent for the bank, and I had acted for Mrs. Evans, in selling the property and taking mortgages to secure the purchase money, and we continued so to act. He

showed me an attornment by Fuller to the bank, admitting Eaton's entry and possession. Eaton then acted as agent for the bank.

I do not know whether, about the middle of September, 1844, Fuller had the right of redeeming the land. He was in possession of it, and occupied it from October, 1842, until now. In October, 1842, Eaton and I, acting as agents, sold the land to Fuller, who directed the deed to be made to W. P. Hardy, although he made the bargain and paid part of the purchase money, and Hardy mortgaged the land. Fuller then went into possession, made repairs, &c., and has occupied till now.

In the summer of 1844 the notes to Mrs. Evans, for which Hardy had mortgaged half the land, not being paid, I called on Fuller several times for payment. He promised, but did not pay. Eaton, at length, showed me the attornment above mentioned. I made a similar one of the same date, and Fuller signed it. But I was not satisfied that Fuller's acknowledgment would be sufficient to foreclose Hardy's mortgage, and notified Fuller that unless Mrs. Evans' debt were paid, I should bring a suit before the September term. Nothing having been done, on the 2d of September, 1844, I brought a suit on the mortgage.

After the service of the writ, and a few days before the court, Eaton and Fuller called at my office, Eaton acting as the counsel of Fuller. Fuller desired to know if some arrangement could not be made about Mrs. Evans' mortgage; that he could pay then, but was going to Baltimore, and it would accommodate him if payment could be delayed until about the last of October, 1844, when he expected to return.

I said that if he would pay then, no advantage would be taken of the foreclosure under the acknowledgment of entry and possession, which would expire before, and that I would not enter the suit, but I wished to be assured of payment at the last of October, without fail. He said I should not be

disappointed, and I agreed to his proposition, and did not enter the suit.

Fuller then asked Eaton if the same arrangement could not be made in relation to the bank mortgage, and Eaton assented, as I understood it, agreeing that payment of the bank debt might be made the last of October, and no advantage should be taken of their foreclosure.

Eaton professed to act as Fuller's counsel, in relation to the Evans mortgage, and the suit thereon.

Fuller remained in my office about twenty minutes. Eaton spoke about a negotiation, by Fuller, to obtain money from the Savings' Bank. I got the impression that Eaton was acting as Fuller's friend and agent, in procuring the loan.

Fuller agreed to pay me $200 on the Evans debt, on his return from Baltimore, leaving $450 due. I understood that he was to pay the sum on the bank debt, on his return, about the last of October, 1844.

About the 2d of November, 1844, Fuller paid me the $200. No advantage has been taken of the acknowledgment of entry and possession.

After the conversation at my office, in September, 1844, Eaton said he did not think Fuller intended to redeem. I said I thought he did, as he had made such repairs, &c.

The Evans place had been set off on execution against George Kent, in favor of the Exeter Bank, and Eaton told me he had made an arrangement with the bank, by which he was to pay their debt and take the property. This was, I think, before Fuller's return, but it might have been after.

Upon cross-examination, Fletcher said that some time after the arrangement about the extension, Eaton told him he had no authority from the bank to extend the time.

Fuller testified as follows :

About the middle of September, 1844, I called on Eaton, at his office, and told him I had got the money to pay the

mortgage of the bank, but that it would accommodate me if they would wait until I returned from Baltimore, the last of October or the first of November. Eaton said that it would be satisfactory to the bank to wait; that all they wanted was their money. I then asked Eaton to walk to Fletcher's office with me, and we went. I asked Fletcher if it would make any difference whether he had the money then or when I returned from Baltimore, the last of October or the first of November. He said he had no objection to waiting, if I would be punctual. He then turned to Eaton, and asked him how the arrangement to wait would suit him. Eaton said it would be satisfactory, or something to that effect. It was then agreed between Eaton and myself and Fletcher and myself, that they would wait for the money until my return from Baltimore, the last of October or the first of November, and that no advantage should be taken of the expiration of the time for foreclosing the mortgages under the acknowledgments signed by me.

On the 5th or 6th of November, on my return, I called on Eaton, and told him I had come to pay the bank mortgage, according to agreement. He asked if I had got the money. I told him I had got the greater part of it, and had a note which I wished him to take. He took the note, looked at it, and asked me if it was good. I told him it was, but that Mr. Odlin knew and could inform him. We went to Odlin's store. He said it was good. We then returned to Eaton's office. There Eaton told me that he had purchased the mortgage, or the property; that the mortgage had been foreclosed in October, at the expiration of a year from the time when I acknowledged entry and possession, and that the premises were now absolutely his own. I was so overcome by this that, at first, I could make no reply, and shed tears. I then asked him what could be done. He said if I would give him $300 beyond what was due, I might have the place as before. This I declined, and proposed to raise all the money upon the bank notes, and pay

McNeil v. Call.

the whole debt at once. He refused to take this. I re-
minded him of his agreement at Fletcher's office. He
finally agreed to take the debt and $200 bonus, but I de-
clined.

For the defendant, Ephraim Eaton testified that

A few days before September 7th, 1844, Fuller told me
that he had agreed with Fletcher to delay the foreclosure of
Mrs. Evans' mortgage, and desired me to go and bear wit-
ness to the agreement. As we entered the office, Fuller
said to Fletcher, in substance, " it is agreed that if I pay
the amount due, at any time in October, there shall be no
advantage taken of the delay." Fletcher replied that there
should be none. Fuller stopped but a moment. I was
there simply to hear Fletcher's agreement. Nothing was
said about the foreclosure of the bank mortgage. I did not
agree to delay the foreclosure, nor was any thing said about
it while Fuller was present.

It appeared in evidence that on the 18th of July, 1842,
Timothy Farrar, the cashier of the Exeter Bank, wrote
Eaton as follows : " Since I conversed with you in this
town, (Exeter,) I have again called the attention of our
directors to the subject of the sale of the Kent property, and
am authorized to say that they will quitclaim to such per-
sons as you may designate, in such parcels as you please,
receiving the purchase money till their claims are paid, and
your guarantee that they shall be paid in full, including the
original debt, costs, expenses and interest, deducting what
they may have received for rents, and that the whole shall
be closed within a reasonable time, say one year from the
time of making the first sale. Any thing that may be made
out of the property, beyond thus indemnifying them, to be
for your own benefit."

*Perley*, for the plaintiffs.

Upon the evidence, there is but one point in this case for
consideration. Hardy, owning the land, mortgaged it to

the Exeter Bank, and in March, 1843, he conveyed his interest in the premises to Fuller. In the month of April, 1845, the bank assigned their interest in the land to the defendant, and in the month of July following, Fuller tendered to the defendant the amount due on the notes.

The plea in bar states that on the third day of October, 1843, the bank took possession of the premises. The only fact stated in the bill, and denied by the answer is, that there was any existing right to redeem the land. The defendant might have denied, in terms, the existence of this right, but he states certain facts, which amount to an argumentative denial, and the question arises whether there were any equity of redemption, and it is necessary, also, to consider what is the specific performance of an agreement to waive the foreclosure.

We say that in the month of September, 1844, there was a waiver of the foreclosure.

The parties may change the character of the possession, which was, at first, taken for the purpose of foreclosing, at any time during the year. This change may be specially agreed upon, or it may be proved by the acts or the course of conduct of the parties. After the expiration of the year, a foreclosure may be opened by the receipt of money, and by various other circumstances. In the case of *Fay* v. *Valentine*, 5 Pick. 418, it was held that where a mortgagee, after having recovered a conditional judgment, in an action for the possession, entered for condition broken, and afterwards entered under the judgment, the last entry was a waiver of the first. *Willard* v. *Henry*, 2 N. H. Rep. 126; 6 N. H. Rep. 12; 11 N. H. Rep. 474; 4 Greenl. 495; 8 Vermont Rep. 164. The case of *Hall* v. *Cushman*, decided within a few years in the county of Coos, is in point. In that case, the plaintiff said that he would not foreclose without giving the other party notice, and it was held that after this it would be fraudulent for the plaintiff to foreclose without notice.

We say, in the second place, that there was a fraud in this case, to mislead the owner of the equity, which will prevent a foreclosure, even if there were no agreement to waive it. 11 N. H. Rep. 482; Hovenden on Fraud 194; 14 Vesey 289.

Call, the defendant, stands in the place of Eaton. Eaton told Call, and Call knew that Fuller claimed the equity of redemption.

We contend, also, that the plaintiffs are entitled to costs. If a mortgagee make an unjust defence to a mortgager, he may be compelled to pay costs. 2 Hovenden on Fraud 187. It is admitted that a tender was made in the month of November, 1844, and in July, 1845, and the money might have been had at any time. The mortgagee refused to accept any sum whatever except as a *bonus*, but any thing that amounts to a fair offer to pay will prevent a forfeiture. A tender was unnecessary to give us the right to redeem, but the tender may affect the question of interest and costs. Hardy's equity of redemption was worth $150 more than the other half. He would not have lain by and have suffered the property to be lost.

Did Eaton profess to act as agent for the Exeter Bank? He was the agent to bargain about the foreclosure. Eaton is contradicted in every material part of his testimony. He had an interest coupled with an authority, which, therefore, the bank could not revoke. Eaton went with Fuller as his counsel, and Fletcher's statement is as strong as Fuller's. Eaton, at last, determined to stand on his foreclosure, unless he could get a bonus of $200 or $300. Eaton, however, swears that he made no agreement whatever in relation to the foreclosure; that he was present merely for the purpose of hearing Fletcher's agreement, and that he had no power to act for the Exeter Bank. But this story is improbable in itself. It stands contradicted throughout. Eaton is interested to the full amount of all that Call may suffer in the matter. Eaton wrote two letters to Fuller,

and proved them by his testimony. What was this for, unless Eaton supposed his doings were to be investigated?

The matter of the agency we do not think material, but Eaton's story about it is contradicted by the evidence in the case.

*Eaton*, for the defendant.

The agreement to accept the money was an agreement for the sale of land. This was void, for as it was after the foreclosure, the agreement is void by the statute of frauds. At the time to which the agreement referred, the legal estate would be in the defendant's grantor. The fulfilment of that promise would change the property from a fee simple to a conditional estate. The promise was to convey the equity of redemption, on receiving the money due on the mortgage. *Botham* v. *McIntier*, 19 Pick. 346. The force and effect of the statute make the foreclosure, which is a statutory mode of conveyance. If the time can be lengthened fourteen months, it can be shortened ten months, and thus a man may part with an estate in land by parol. A performance cannot be decreed, where the fraud alleged is a mere breach of 'promise. 11 Mass. Rep. 345. If the agreement to accept the money is not within the statute, then the agreement to pay the money and retake the land is not within the statute. The case of *Marble* v. *Marble*, 5 N. H. Rep. 374, is against any such position as that.

The agreement was without consideration, and cannot be enforced in law or in equity. The postponement was at the request of Fuller. Eaton was to receive no benefit, but all the benefit was to be Fuller's. Eaton sought nothing and asked no favor, and there was no loss to Fuller by the desire of Eaton. An agreement must bind both parties or neither. If Eaton was bound to receive the money, the plaintiff's grantor could not pay it before the time, which was over a month, had expired. Fuller bought the place and made the first payment, and yet he says that Hardy

bought it; he thus starts with a falsehood in his mouth. Any thing beyond the debt due the bank was for Eaton's benefit. The bank account was adjusted and settled on the 10th of October, 1843, a week after the entry to foreclose. From this date up to the month of October, 1844, Eaton had no interest in the land. The only discrepancy between Eaton and Farrar is, that Farrar does not remember the agreement between Eaton and the bank. Eaton said to the bank, in substance, " if you will foreclose on any of these debts, I will redeem," and the accounts are various as to the actual agreement that was made.

If a contract for delay was made in Fletcher's office, why did Fuller, in his letter to Eaton, request him to call on Fletcher, and ascertain if the debt could remain until he should come back to Concord? Why did he say he would pay the balance of the $1100 in October? Fletcher agreed that he would accept the money in October; what more, then, was wanted?

We suppose that Fuller was plotting to get some advantage over Eaton, and without such a supposition the facts cannot be explained.

The question, raised by reserving the benefit of the answer to the hearing, was, whether the reception of the money was sufficient to waive the foreclosure. The plaintiff should have filed a bill for specific performance. It is the actual reception of the money, and not the agreement to receive it, which constitutes the waiver, and no evidence is admissible but such as tends to prove that single point. The plaintiffs say that there is fraud in us, and that opens the whole matter, while we say that the fraud was in Fuller. There was no mutuality nor consideration for the contract to waive the foreclosure. The agreement was void by the statute of frauds, because it was an agreement for the sale of lands, and was not in writing. The object of the plaintiffs was to force Eaton to do what he had no right to do. Mrs. Evans could not be compelled to receive money not yet due.

*Perley*, in reply.

It is difficult to see how Fuller could come back and pay the mortgage debt in the month of November, if it was foreclosed on the 3d of October. There could have been no *plot*, except to induce Eaton to receive the whole amount one month later.

GILCHRIST, C. J. The agency of Eaton is sufficiently proved. The letter of Farrar, dated on the 18th day of July, 1842, shows that he was authorized to sell the property as he should see fit, upon his guarantee that the bank should be paid in full, and that all he should receive beyond the amount of the debt due the bank, should be retained by him for his own benefit. Fletcher says that Eaton acted as agent for the bank, and so says Fuller, until at last Eaton told him that he had bought the equity of redemption. In the case of *Willard* v. *Henry*, 2 N. H. Rep. 120, it was held that where a grantor remains in possession of land subject to a condition to be performed by the grantee, and the condition is broken, the forbearance by the grantor to make a claim to retain the possession for the condition broken, is sufficient evidence that the forfeiture is waived. The case of *Bachelder* v. *Robinson*, 6 N. H. Rep. 12, decides that though an entry and possession by a mortgagee may have been sufficient to foreclose the right in equity to redeem, yet if he accept all the money secured by the mortgage, it would be a waiver of his entry for that purpose. In that case, Atkinson entered for breach of condition, in the spring of 1828, and accepted the debt on the 3d of December, 1830. So the receipt of a part of the debt is a waiver of the foreclosure. *Deming* v. *Comings*, 11 N. H. Rep. 483.

If an assignment be made of the mortgage, just before the expiration of the equity of redemption, to prevent the redemption, that may be regarded as a fraud, of which the party shall not take advantage to foreclose the mortgager or his grantee, until he shall have had a reasonable time to

make a tender to the assignee. If the assignment be made without such intent, it may keep the equity open until the mortgager, or those claiming under him, can find the assignee and offer to perform the condition. *Deming* v. *Comings*, 11 N. H. Rep. 482. An agreement in writing by a mortgagee, after an entry for condition broken, that he will re-convey the premises whenever the debt shall be satisfied out of the rents and profits, or otherwise, will enable the mortgager to maintain a bill in equity to redeem, although more than three years have elapsed since the entry. *Quint* v. *Little*, 4 Greenl. 495. So an entry for condition broken may be waived by a subsequent entry. In *Fay* v. *Valentine*, 5 Pick. 418, a mortgagee having recovered a conditional judgment in an action for the possession, entered for condition broken, and afterwards entered for the judgment. It has been decided, also, that it is competent for a court of equity to take away from third persons the benefits which they have derived from the fraud, imposition or undue influence of others, although the third persons may not have been parties to the fraud. *Hugenin* v. *Baseley*, 14 Vesey 273. It has also been held in England that there are certain acts of the mortgagee which will of themselves open a decree of foreclosure. Thus, on a suggestion of a gross fraud, the court will, upon an original bill, overrule a plea of a decree of foreclosure, if the suggestion of fraud be not denied. *Lloyd* v. *Mansell*, 2 P. Wms. 74.

In the case of *Hall* v. *Cushman*, decided in the county of Coos, at the December term, 1843, Cushman, in reply to questions respecting his mortgage, said that " he did not expect to look to his mortgage for indemnity, but if there should be a small balance due him, he would notify Hall or his counsel." It was held that the application was in the nature of a call for an account; and there was an express stipulation that if he relied on the mortgage, he would render an account; that the court did not undertake to enforce this specifically as a contract, but that it would be in bad

faith and fraudulent for the party, after having made this declaration, upon which the other party might well rely, to attempt a foreclosure, under the ordinary provisions of law, without notice. The foreclosure was therefore kept open. In the case of *Crane* v. *The Claremont Iron Foundry Company*, decided in the county of Sullivan, some time since, Heywood, who had notes against the company, had made an entry to foreclose. He was afterward summoned as the trustee of the company, and he brought forward this claim, treating it as an unpaid debt. This was upon the first trial of the case. Afterward he reviewed the action, and, although a year had expired since his entry, it was held that his bringing forward this claim was a waiver of the foreclosure.

Now we are satisfied from the evidence in this case, that Eaton assented that if the debt due the bank should be paid in the latter part of October, no advantage should be taken of the foreclosure. Eaton had, as has been before stated, sufficient authority to make such an agreement. He had a personal interest in the transaction, because the bank agreed that he should retain for his own benefit all that he should receive beyond the amount due the bank. That he did in fact make such an agreement, is positively stated both by Fuller and by Fletcher, and, although the agreement is denied by Eaton, the weight of evidence is as we have stated, and the effect of the agreement was, according to the authorities, to extend the time of payment, and to keep the foreclosure open until the latter part of October. The tender to the bank of the sum of $377, made by Fuller on the 11th of November, 1844, was therefore in sufficient season. The plaintiffs are entitled to a decree, according to the prayer of the bill.

Another question arises as to the costs. In the case of *Detillin* v. *Gale*, 7 Vesey 583, a question arose how far a mortgagee was entitled to costs. It appeared that great delay and expensive litigation had been occasioned by the

mortgagee's conduct before any account could be procured from him, and it was finally reduced by more than one-sixth part. Lord *Eldon* held that though a mortgagee acting reasonably as such, was to have his reasonable costs, it did not follow that he could claim his own expenses from other persons with whom he was litigating with regard to those acts which, upon his part, were not only unreasonable, but grossly oppressive. He was therefore compelled to pay the costs of the inquiry, because, as to that, he could not be considered as mortgagee; and it was admitted that there was no precedent for making a mortgagee pay costs; his own costs were given him down to the answer, and no further.

In the case of *Slee* v. *Manhattan Company*, 1 Paige 81, it was held that in general, on a bill to redeem, the plaintiff pays costs to the mortgagee, although he succeeds in obtaining the relief claimed. But where the mortgagee has set up an unconscientious defence, he has not only been refused his costs, but has been compelled to pay costs. *Brockway* v. *Wells*, 1 Paige 617. Where a party entitled to redeem offers to pay the defendant the amount equitably due, before he files his bill to redeem, he will not be charged with the defendant's costs. *Van Buren* v. *Olmstead*, 5 Paige 9.

These authorities justify us in decreeing that the mortgagee should not recover costs against the plaintiffs, and as this defence is entirely unconscientious, it is equitable that he should pay costs.

The question of costs seems also to be settled by the Revised Statutes. The first section of chapter 191 provides that costs shall follow the event of every action or petition, unless otherwise directed by law or by the court. The seventh section authorizes the court to limit and allow such costs as they may deem just and reasonable. In the present case, the plaintiffs are substantially the prevailing parties. They have shown their right to redeem and to maintain their bill. By the Massachusetts statute of 1798, chapter

77, the court were authorized, "at their discretion, to award costs to either party, as equity may require." In the case of *Saunders* v. *Frost*, 5 Pick. 271, 274, the court refused to award costs to the mortgagee, the defendant in the bill to redeem, and held that the rule that the mortgagee is, under no circumstances, chargeable with costs, is not only unreasonable, but opposed to the statute above cited. It appears to us to be equally opposed to the provisions of the Revised Statutes of this State. The tender of $377, made by Fuller to the Exeter Bank, on the 11th day of November, 1844, and his tender to Call of the sum of $209 10, on the 6th of July, 1845, will of course stop the accruing of any interest after those dates respectively.

The judgment of the court is, that the plaintiffs are entitled to costs, and to a decree according to the prayer of the bill.